**AFFIRM; and Opinion Filed September 8, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00361-CV

### IN THE INTEREST OF N.E., A CHILD

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF12-13599-Z**

### No. 05-15-00363-CV

### IN THE INTEREST OF K.G., M.G., AND Ma.G., CHILDREN

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF13-17435-Z**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Whitehill
Opinion by Justice Lang-Miers

These appeals are from final decrees terminating the parental rights of TGW (Mother) to

children N, K, M, and Ma, and JW (Father) to children K, M, and Ma. The parental rights of N's

father, JE, were not terminated and JE is not a party to this appeal; consequently, we refer to JW

as Father. For the reasons that follow, we affirm.

### BACKGROUND

Mother and Father began an on-and-off relationship in 2007. At that time, Mother had

one child, N, from a previous relationship with JE. N was born in 2005. In 2010, Mother gave

birth to K. Mother's aunt, Valerie Carlton, a school teacher in Cleburne, said she met Father in 2010 when Mother was pregnant with K. She described the relationship between Mother and Father as "pretty rocky." She said "it started out, I think, pretty well. But we have known of occasions where he was violent and [Mother] had to leave the home." Carlton said Mother came to stay with her in 2011 because Father hit her in the head. Mother "had an open wound and she was bleeding"; "[s]he had blood on her head and it was running down her face and her shirt was filled with blood." Mother was "very upset," "crying," "very anxious, "[v]ery excited." Mother had N and K with her. Carlton told Mother to leave the children with her and to go to the hospital and call the police. Mother stayed overnight and left the next day with the children; Carlton did not know if Mother went to the hospital or called the police. Mother said she was going to her parents' house in Cleburne. Carlton said "the next thing I heard of [Mother and Father] were back together."

Carlton also testified about an incident in 2012 when Mother and the children stayed with her a couple of nights. She said Mother came to her house and said "she's had an altercation with him." Mother was wearing dark glasses, and when she removed them Carlton saw Mother "had been hit, and her eyes were red"; one eye was swollen and bruised. Carlton said they were trying to hide Mother and the children from Father because Carlton knew that Father would try to harm Mother.

Carlton testified that on one of these occasions Mother needed some items for the baby, and Carlton took Mother back to the house where Mother and Father lived. They knocked on the door and Father, who was outside, came around to the fence "using profanity" and yelled at them to leave because "it was his house . . . he paid the note . . . he paid the bills . . . and . . . she was not getting in and told us to get off the property." Carlton said Father appeared "to be under the influence of something."

In June 2012, Mother went to the emergency department of Methodist Dallas Medical Center complaining that Father had assaulted her; she was six weeks pregnant with M. A nurse told Dianne Scoggins, the emergency department social worker, that Mother was complaining about domestic violence. Scoggins talked to Mother about what happened, and Mother said Father had "kicked her in the abdomen, kneed her in her vaginal area, and then pulled a knife on her." Scoggins said she remembered that Mother was "very fearful when she came in and that's why I wanted to make sure she got all the help she needed to get." Mother told Scoggins that "she had been in a domestic violence abuse situation prior with the same gentleman." Mother also told Scoggins that N and K were there during the assault. She said she told them to go to the neighbor's house to get help. Scoggins's report said "it was reported that when the police arrived [Father] had pushed [Mother] in front of the police officer . . . ."

Scoggins reported the incident to the Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services ("the Department"). Together they arranged for Mother to go directly to a shelter, but Mother said she had to go home and get her other children. Mother never went to the shelter.

The Department opened an investigation into neglectful supervision and physical abuse of the children. Mother told Alisha Wakefield, the Department investigator, that she was "staying with friends right now." "She said she feels pretty safe right now. She said she has been looking for a shelter, but they are all currently full. She said the baby is fine and was not injured during the incident. She said the argument started because she did not want to leave Texas with [Father] to go to California" where he is from. Mother told Wakefield that she was "due in November" and

> is not willing to be a victim. . . . She said she is willing to allow [Father] to have
> supervised visitation facilitated by an organization, so that she does not have to
> have any contact with him. She said the incident is scary when she thinks about it.
> She does not feel like he was serious when he was waving the knife at her. She

said she does not feel as if he would have actually tried to kill her. She said she was not going to take that risk because she does not want her kids around that. She said she cannot put herself back in that situation. She said she lost her mother in October. She said she does not want CPS to be involved because she did not want her kids taken away from her, even for an hour. She said she does not trust anyone with her children. She agreed to meet with me, but would have to get back to me with a time.

Wakefield set up appointments to meet Mother, but Mother always cancelled. On the last phone call, Mother told Wakefield that "she did not want to press charges because she does not want any retaliation done to her by him or his family. She said she has been going to counseling and to her church and she feels as if this is in the past and she just wants to move on with her life."

Wakefield also talked to Father. He told her that "he was in trouble" in May and June of 2012 because of statements Mother made about him. He indicated "that he and [Mother] had a toxic relationship" and he questioned whether K was his. He said he believed K was JE's child and that Mother was pregnant with JE's child, not Father's. He also blamed Mother for his "financial failure." He told Wakefield that he also had been in trouble in 2009 for domestic violence. He indicated to Wakefield that Mother had cut herself, "pretty much blamed it on him and that he didn't do it." Father told Wakefield that he believed "something is pretty much wrong with her mentally."

The Department ultimately "ruled out" any physical abuse against the children, was "unable to determine" whether there was neglectful supervision, and the investigation was closed.

M was born in November 2012. In July 2013, Mother gave birth to Ma at home two months prematurely. Mother and Ma went to Methodist Charlton Medical Center; both tested positive for marijuana. Ma was transferred to Methodist Dallas Neonatal Intensive Care Unit where she stayed for two months. Linda Amie, a social worker in the NICU, asked Mother about

her education, other children, use of drugs, alcohol and cigarettes, thoughts of suicide, and similar questions. Mother told Amie it "had been a while" since she used marijuana. When Amie told Mother that Mother and baby tested positive for marijuana, Mother "initially said . . . that she didn't know she was pregnant until she was five months pregnant" because she had just had a baby in November. Then "she said that she had neighbors that would bring her to the hospital to see the baby and that they smoked marijuana and so it's possible that that's how she was positive." But Amie told Mother that the presence of marijuana in "the baby's meconium would not be possible from the neighbors in the car smoking the marijuana."

Amie asked Mother about her resources, and Mother said she was not working because of the baby, she did not have money to pay rent, and she had to depend on others to get her to the hospital. Amie was unable to get an address for Mother. Amie advised Mother about transportation and other types of resources. The NICU visitor's log showed Mother visited Ma late at night about every three or four days for about fifteen minutes each time. The log showed Father visited Ma twice.

The Department opened a new investigation as a result of Ma's positive marijuana test. Calandria[1] Bailey, the Department investigator assigned to Mother's case, talked to Mother by phone about the open investigation. Bailey said Mother "appeared to be concerned and shocked that she had a CPS case." As part of the current investigation, Bailey asked Mother about the June 2012 incident. Mother denied the allegations, said they "were not true" and that "the previous case [sic] lied on her[.]" She denied making a domestic violence outcry and denied saying she needed help.

---

[1] The reporter's record spelled Ms. Bailey's first name "Chalandria." However, we note from the record that the proper spelling is that used in this opinion.

Mother told Bailey that K and M were staying with Father and that she did not know where they lived. She said N was staying with her at her grandmother's house in Cleburne. But grandmother told Bailey that Mother did not live there and that she was staying in Dallas. Bailey tried several times to meet in person with Mother, and Mother "always [had] an excuse, one after another" for why she missed the appointments. Mother talked to Bailey's supervisor by phone and told the supervisor where N was going to school. Bailey went to the school, but N was not there; Mother had taken her out of school. The school did not have an address for N and Mother.

When Ma was ready to be discharged in September 2013, Bailey told Mother by phone about a service plan she would need to sign. It required Mother to agree to "work services with the department," avoid contact with Father, and refrain from drug use. Bailey waited about two hours at the hospital for Mother. She called Mother, and Mother said she was "caught in traffic . . . ." Mother never arrived at the hospital to pick up Ma. Instead, Father came for Ma.

The nurses reported that Father showed up at the hospital with a car seat and asked for Ma. Amie said they were unable to release Ma to Father without the Department's approval and that the doctors wanted Father to "room in with the baby to show that he could care for the baby." Amie described Father as being "somewhat aggressive to the nursing staff" and "a little confrontational" to her. He told Amie that "he was the father and that he was tired of the man trying to break up black families and keep black people down . . . ." He told Amie, "sister, I can't believe you're helping them keep the man down." She said she had "concerns about discharging the baby to" Father because of domestic violence.

Bailey told her Department supervisor that she and Amie were concerned about releasing Ma to Father, but the supervisor made the decision to discharge Ma to Father. Father agreed to room in with the baby and signed a service plan in which he agreed to keep the children away

from Mother. But because the hospital could not discharge Ma to Father without Mother's authorization, Mother came to the hospital that night and signed a third-party authorization.

The next day, the hospital discharged Ma to Father. He said he was taking Ma to Round Rock where he lived with K and M at Father's brother's house. The Department tried to follow up with Father in Round Rock, but he did not respond to its calls. The Department sent a special investigator to Father's brother's house and learned that Father did not live there and was staying at a motel.

The Department's program administrator became "very upset regarding the staffing" and "upset that either parent were [sic] even considered to have the children placed with them." As a result, in October 2013, the Department took possession of K, M, and Ma from Father, but Mother was hiding N. At a hearing, the court ordered Mother to provide the address where N was staying and to remain in the courtroom while the Department went to the address and took custody of N.

In November 2013, the Department placed all the children with Carlton, the children's great aunt who lived in Cleburne, and the court authorized supervised visitation at the Department's offices. The court also ordered the parents to complete parenting classes, domestic violence counseling, individual counseling, random drug tests, and Father was to complete the Batterers Intervention Prevention Program. At one of the court hearings, the court ordered Mother and Father to submit to a drug test; Bailey said she was "concerned" about the results of those tests.

Bailey testified that she observed two visits between the children and Mother and Father at the Department's offices, and in those two visits the parents interacted well with the children, brought snacks, and played with the children. Bailey did not observe the children fighting and

said "[t]hey were always happy." The parents would "always hug and kiss on their kids when they left" and the children sometimes were "upset that the parents were leaving[.]"

Maricella Rangel testified that she worked for the Department and transported N, K, M, and Ma from Cleburne for visits with Mother and Father at the Department's offices from November 2013 through January 2014. She said her job involved taking the children and parents into the visitation room and waiting with them until a caseworker arrived to supervise the visit. Rangel described her rapport with Mother as "good." Sometimes Rangel allowed Mother to take the children to Rangel's car, and Rangel gave her phone number to Mother.

Rangel recalled that in December of 2013 a visitation was cancelled due to an ice storm. Father called Rangel at home and "used some language that's inappropriate." He wanted to know if the visit would be made up, and after checking with her supervisor, Rangel told him it would not. Father told Rangel "he's going to get his f– visits. For me – for me to be sure of that. . . . [Y]ou're keeping me from my children and that's not right."

Rangel recalled another visit in January 2014 when she brought the children in for a visit. M had a hat on because it was cold. Father took M and sat down in a chair. Father removed M's hat and saw that M's hair had been cut. Father was "very angry." He stood up with M in his arms, shoved the chair, and asked to see a supervisor. He said, "I don't know why they cut my baby's hair. These are my f– kids. Nobody puts their hands on my kids. Nobody gave nobody permission to touch my kids' hair."[2] Rangel said Mother was in the room and was holding Ma and did not attempt to calm Father down. Rangel went to the front to tell security and security went to the visitation room. Rangel did not see what happened after that. A couple of days later, Rangel told her supervisor that she was uncomfortable with Father and she did not want to transport the children any longer. Rangel testified that she was scared of Father, that the haircut

---

[2] Carlton described M's hair before it was cut as "very long, like Don King long." It was M's first haircut; he was one year old.

incident "was the second time [she] had heard aggression in [Father] and [she] just didn't feel comfortable anymore."

Carlton testified she was aware of a phone call Father made to Carlton's mother in which he "said he was coming down to my mother's apartment and kill her and then he was coming out to my house and take care of me, also." She testified that she believed Father to be "a violent man." It was unclear when Father made these statements.

Carlton also testified about an incident in which Father made threats because Carlton was taking the children to Carlton's mother's house and a homosexual nephew was there at the same time. Father told Carlton's mother that "he felt like his children were in danger" by being around the nephew. Father wrote "a letter of threats and lots of other ramblings" and sent it to Carlton's employer, the principal of the school where she worked. The letter was introduced into evidence and published to the jury. In the letter, Father accused Carlton of verbally abusing him in front of the children. He said Carlton was in violation of (E) because she engaged in conduct or knowingly placed the children with others "who engaged in criminal and homosexual activities[.]" He accused other relatives of having a criminal history, open investigations with the Department, and engaging "in drugs, criminal activity" and having a house "full of felons and Drunks[.]" Carlton testified that Father "continued to be worked up" about the nephew being around and sent her text messages, including one that made her concerned about exposing the children to the nephew. In the text message, Father told her that if she "continue[d] to let his children be in the presence of [the nephew] that there would be consequences." She said she "took that as a threat."

Early in the proceedings, the court asked the Department "to look into" a monitored return of the children to Mother, and the Department did, but Brown said she did not agree that a

monitored return was appropriate.[3] Jessica Thomas, the Department's "legal caseworker" on this case since November 2013, testified that the Department could not consider a monitored return without a visit to the residence. She said it took "at least a month" to visit the residence because Mother and Father would not give her a "good address . . . because they would say, well, we're living here but it's temporary or we are changing addresses or we used to live there but we're going to move so I don't have an address to give you right now . . . [and] sometimes they wouldn't respond when I asked for the address." And Thomas said that "was just the first time" she tried to visit the home between December 2013 and January 2014. Through February of 2014, Mother and Father told Thomas that "they were not a couple."

In February or March 2014, Mother and Father asked to meet with Carla Brown, a supervisor at the Department. Brown testified that Mother "seemed to be in great pain[.]" Mother "had a limp, and she was favoring her left side." Mother also showed Brown "a bruise on her shoulder and things of that nature . . . ." Brown asked Mother what happened, and Mother said "it was an incident at the court with [JE], the father of her oldest child." Mother told Brown that JE "pushed her" by the escalators and elevators and that she either fell or almost fell to the floor. She said the incident was witnessed by other Department workers and attorneys.

Thomas testified that she saw the confrontation, but was unable to hear what was being said. She said Father approached JE and that JE never touched Mother. JE gave a statement about what happened and filed a complaint. Mother also filed a complaint stating that JE "had beaten her up at court." Mother claimed "she had to stay in a domestic violence shelter" for three days because she was afraid of JE. She said she was three months pregnant at the time and "had to go to the hospital because she started spotting[.]"

---

[3] She explained that a "monitored return is when the department makes a decision to return children to a parent . . . while we still monitor that placement. So we still are temporary custody but we place them back in the home . . . so we can figure out if this situation is going to work."

Based on Mother's affidavit, JE's parole was revoked. Thomas testified at JE's parole hearing, and three weeks later JE was released. When Father was asked about this incident at trial, he said, "Everything happened so suddenly. And I think that I would be making an unfair analysis by trying to – that was about a year ago." He said he remembered picking Mother off the floor and "just recall[ed] her stumbling" but did not remember how she stumbled. He said he went to the VA hospital the next day for a scheduled appointment and Mother went with him, but he did not know if she saw a doctor while she was there. Father said "he had received a ticket from the court because he was trying to protect [Mother] at the time from that assault."

Thomas said this "was a huge concern for the department because it was, again, an incident in his pattern of aggressive behavior." The Department asked the trial court to order a psychiatric evaluation of Father, but the court ordered him to enroll in the batterers program instead. At a court hearing in May 2014, Father had not signed up for the batterers program and "said he did not need it." However, he enrolled in the classes at some point. At the same time the court ordered Father to complete the batterers program, it ordered him to pay child support each month. As of the date of trial, Father had paid only a fraction of the support due.

Walter Mason, a social worker/counselor for the batterers program, testified that he was the leader of Father's class toward the end of the program. Mason explained that the program is 24 weeks and is "designed to change the thinking of the men . . . to prevent them, if possible, from battering women and children." Each group session lasts about 90 minutes. The total cost of the program is $640 and Clients typically pay $25 per visit. Mason said Father paid "$5, $2, or no dollars" each time and had paid about $20 total by the end of the 24 weeks. Father attended Mason's class for the last six weeks; he transferred to Mason's class because of a conflict with his work schedule. Mason described Father's interaction in the class of about 12 to 16 men as "aggressive" and "he likes to take over." Mason said Father would interrupt the

–11–

others as they were trying to voice their opinions and eventually "the other men started checking him on it, about interrupting them and feeling that he had something more important to say than they did." Mason said it concerned him that Father was so far along in the program and was still behaving in this manner; he did not think Father had "learned enough" from the program. Mason said he did not think the program had helped Father because Father "wouldn't allow us to." He said he did not think Father "got enough of information to change the way that he thinks about women and children." Mason said the program was looking for "ownership and accountability for the reason that [a client is] there" and "that never came out" with Father - [n]o kind of admission or anything like that ever came out." He said he would refer Father to "a counselor that can give him the attention that he needs, that he wants or that he needs."

Lisa Foster, another counselor for the batterers program, testified that she filled in one day for Father's group. She started a documentary video on non-violence[4] for Father's group and then went back to her own group. She heard yelling coming from Father's group and went back into the room and saw Father yelling "this is b–s–" to the group. She told Father "you do not have to stay for b–s–. You have the ability to choose to leave. You can leave." She said Father turned his yelling towards her, she asked him to step outside of the classroom, and told him it "was inappropriate that he shouldn't be yelling that way." She said Father "stepped towards" her and did what she "considered puffing up." She felt Father's behavior "was a tactic of intimidation" and it made her angry. She stood her ground, however, and Father apologized and went back in to watch the video. She did not believe the apology was sincere. When she came back into Father's group, she sat by Father and he violated a group rule by taking his cell phone out during the video and "messing with his phone" while she was "sitting right next to

---

[4] Foster said the video was "the documentary of Rosa Parks, Dr. Martin Luther King." She said it was "a great example of how others have used [non-violence as a choice as a way of life] and have done great good in the face of opposition."

–12–

him." She said a counselor has the discretion to not give the client credit for a session "if the phone comes out too much" because it shows "they're not paying attention and they're not participating." Father apologized again at the end of the session, and Foster believed he was sincere.

Thomas described several other interactions with the parents and the children while the case was pending. She said Mother and Father sometimes would make appointments to see her and sometimes would show up "unannounced." She said Father "often would get upset and begin to ramble on about any situation that he could kind of grab at; hair cuts, bruises, bug bites." During one such incident, "security actually had to stand up and then when the security man stood up, [Father] kind of calm[ed] down." Thomas also testified about voicemail messages Father left on her work phone in which he was "yelling at the top of his lungs," "talking about his kids being neglected," and about M's haircut, and cursing in the message. She said the message was an "example of his typical behavior[.]" She said the messages were "concerning to [her] just because of the lack of control of himself even in the voice message." She said she was "concerned about his psychiatric well being." The voice mail messages were played for the jury.

Toward the end of May or early June 2014, Thomas went to a new address given to her by Mother to conduct a home visit; the "home was appropriate, clean, furniture, everything." Mother was pregnant again and told Thomas she was due around September. Thomas asked Mother about her plans for the other children after the baby was born, and Mother said "if [Father] could not be in the home with her, then we might as well go to trial because she needed his help." Thomas said "that solidified for me that she was not going to have a resident [sic] separate of [Father] who at the time had not even began [sic] the [batterers] Program. And at the beginning of June they actually got married." Thomas said the marriage "signified to the Department that [Mother and Father] intend to live their life together."

–13–

At the June 2014 hearing, the Department laid out its concerns to the court. At that same hearing, the court ordered that Mother could have unsupervised visits with the children, but required Mother to keep the children away from Father. On one such visit at the end of June, Mother picked up the children from Carlton's house, drove down the street and picked up Father where he was waiting, and drove to Sonic. The next day, N wet herself while she was standing in front of her closet looking for clothes; she also began to wet the bed and have nightmares. K also began to have nightmares and demonstrate inappropriate behavior. Carlton questioned the children about the visit with Mother, and N eventually told her that Father was with them during the visit. When Carlton told the Department about it, the Department suspended Mother's unsupervised visitation and required her to have supervised visits in Carlton's home.

Thomas testified that she investigated the Sonic incident and interviewed N in late June 2014. N told Thomas that Father was at the visit and also told Thomas that when N was living at home, Father "had hit her with hangars [sic], belts and extension cords." N said Father "whipped her with belts and extension cords and that he, one time, threw a hangar [sic] at her mother and it ended up hitting [N] in the eye." N said Father "had hit her mother before" and when he did, N would take "the two boys away . . . upstairs[.]" Thomas also talked to K's daycare and was told that K "was acting out aggressively." The Department decided to send N and K to a therapist.

Peggy Lynn Smith is a Licensed Professional Counselor and a Certified Reality Therapist with degrees in counseling and child psychology. She testified that she counseled N and K for six months beginning around June 2014 and had eight sessions with each child. Although she had not seen the children since October 2014 due to Carlton's work schedule, she testified that the children needed to continue therapy.

Smith described N as "a delightful child, very, very cognitively well developed." She said N made good grades and was "happy most of the time." During play therapy, N said Father

–14–

"would scare her. She said he hit her. He spanked her. That he hurt mother when she was pregnant." N elaborated about the dreams she was having; N said "she had nightmares that woke her up." N described the nightmares and said "somebody was killing her mommie" and "her mother would die each time[.]" N told Smith that Father hit her and spanked her with belts and extension cords and that one time Father threw a coat hanger at Mother, it missed and hit N in the eye. N told Smith that Father "listens to his music more than he paid attention to her." Smith said both N and K "have been diagnosed with posttraumatic stress" but that she did "not believe it's a disorder at this time because the nightmares did subside." Smith said she was concerned about N's exposure to domestic violence and did not want it to affect her progress at school. She said she was concerned about N continuing to be "a good student and being a happy child."

Smith described K as "more of a power child. He likes to – has leadership qualities but has to have a little more guidance to temper strong emotions." She said she saw K get angry and "shout no and leave me alone." She said K "would protrude his chest out and make negative comments toward his sister . . . or his great aunt . . . when he was upset, didn't get his way." He commented that "daddy killed mommie" in four different sessions. When Smith asked him about what he saw, he said "daddy hit mommie." K also told Smith that he was scared of Father. Smith testified that as the sessions went on, K "actually controlled his anger, reduced the number of incidences at the daycare where he stayed and could tell me colors, things a child at age four should be able to do and interacted appropriately in the session."

At the end of the six months during which Smith saw the children, Smith said neither child wanted to return to Mother and Father, but, instead, wanted to continue to live with Carlton. N had also told Carlton that she was afraid to go back home and that "she did not want things to go back to the way they were." Smith said based on her training and professional observations, the children had been exposed to domestic violence, they exhibited "behavior of

children who were exposed to domestic violence," and that children should not be in a domestic-violence environment "because of the ongoing problems it can cause throughout life." She explained that it was possible that N functioned well in school despite being exposed to domestic violence because children "compensate in environment by excelling where they are safe."

Meanwhile, Mother gave birth to T, and Mother was again uncooperative with the Department by refusing to disclose T's whereabouts. As a consequence, the Department suspended Mother's visitation with the children at Carlton's house in October 2014, but allowed supervised visitation at the Department's offices. Up until that time, Carlton said Mother visited the children every two weeks, "was very good with the children," the children "enjoyed seeing their mother [and] always had very good visits with her." Carlton said Mother "is always a very good mother when she comes around." She bought them clothes, food, and provided "party packets" and cupcakes for N's classmates on N's birthday. But after October 2014, Mother did not attempt to visit the children at the Department. In December of that year, the Department reinstated visitation by Mother at Carlton's house, but Mother did not visit the children. Carlton called Mother about visiting the children around Christmas, and Mother said "she was planning to have a quiet Christmas." The next time Carlton heard from Mother was in January 2015, about one month before trial.

Carlton said that her relationship with Mother deteriorated during this time. She said that Mother was once "a very independent person and a very strong woman" but "now I really cannot tell her voice from his voice." She said "[t]hey speak with the same mind, the same lingo. . . . She misconstrues anything that is said to her and . . . does not have a good understanding of what's going on." Carlton testified that everyone in the family "tried to stop [Mother] or dissuade her from having a relationship with [Father]" because of the violence. She said it affected the relationship between Mother and the rest of the family because Mother would not

stay away from Father. The family had concerns that Mother "was isolating herself from" them and that Father "was involved in isolating her from" the family. But Carlton said she had seen improvements in Mother's interactions with the family, and she thought the Department's services had helped Mother. Carlton did not believe that Mother's rights "should be forever terminated to her children," but she also expressed concern about Mother's "unwillingness to acknowledge [Father]'s domestic violence tendencies" and her ability to protect the children.

Carlton testified that regardless of whether Mother's parental rights are terminated, she has "asked CPS to remove the children from my home." She said "over this last year and three or four months I've had nothing but egregious behavior from the two of them in their text messages, in their phone calls. I think that it would be harmful for my health as well . . . . I feel like they would continue to harass me, call me, send me crazy text messages, phone calls, still trying to see the kids because I'm the aunt, I'm still related to them. . . ."

Father testified at trial and said he has never engaged in domestic violence against Mother and denied every incident of domestic violence. He said he and Mother have had "misunderstandings" and there have been times when they did not agree. He denied talking loudly in the batterers class, denied getting into the counselor's face, and said he did not make statements that watching the video was "b–s–." He said the voicemail messages were "definitely the wrong way to communicate that. But like I said, I was hurt and I tried to express the dynamics of what I was, what I was experiencing at that time. And I lost my cool." Father testified that he heard his voicemail messages and agreed that "it was a stark contrast between the way [he is] now [at trial] to what was on that voicemail." He explained the contrast at trial as his "classroom voice" and the voice on the messages as his "outside voice." He said when he left the voicemail messages he was feeling "[h]urt, disappointed, sad, helpless . . . [v]ictimized . . . [and] frustrated."

Mother also testified at trial and denied all allegations of domestic violence by Father against her, said it never happened, said she never told the social worker about domestic violence, denied going to Carlton's house with an open head wound, denied asking for help, and said Father never committed violence of any kind against her. However, she said N's father, JE, had been violent with her. Mother admitted accusing Father of domestic violence when she went to the emergency department at Methodist Dallas in 2011, but she said "I was mad at him and I made a false statement because he was talking about leaving me. . . . And so I felt like if I couldn't have him then nobody could . . . ." She said that after that incident, Father left her and they had no contact for about a year because Father thought she "was crazy."

Mother said she has never called the police on Father, never felt threatened by him sufficient to call the police, and never felt her life was in danger by him sufficient to call police. Mother said she had no idea where K got the idea that "daddy killed mommie" because K "couldn't talk . . . when he was taken." Mother also denied telling N to take the other children upstairs when she and Father were fighting; she said N would be telling a lie if N said that because she has "never been in that position." And Mother testified that N would not be telling the truth if she said Father spanked her with extension cords and belts. Mother said she believed N was being "coached." She did not believe that N said she was scared of Father, and she did not believe N's statement about the Sonic incident. Mother said she did not know Father to be aggressive or have a temper, she has never seen any aggressive behavior from him, and she did not believe the transporter who testified that Father was aggressive with her. She said she did not believe that Father is "aggressive with other people"; she believed he was "assertive with people." And she said she has never been afraid of Father.

Mother said the reason she had not seen the children since October 2014 is because "[t]he department stopped me." She said she found out later that she could have visits at the Department's offices.

A jury determined that the parental rights of Mother and Father should be terminated, and the court appointed the Department as managing conservator of the children. Mother filed a motion for new trial, which was overruled by operation of law.

On appeal, Mother and Father argue that the evidence is legally and factually insufficient to support the statutory grounds for termination, that termination was in the best interest of the children, and that the appointment of the Department as managing conservator was in the best interest of the children. Mother also argues that the trial court abused its discretion by denying her motion for continuance and her trial counsel was ineffective.

## SUFFICIENCY OF THE EVIDENCE

Mother and Father challenge the legal and factual sufficiency of the evidence supporting the termination of their parental rights. The Texas Family Code authorizes a court to terminate parental rights if the factfinder finds by clear and convincing evidence that the parent engaged in a proscribed act or omission and termination of the parent-child relationship is in the best interest of the child. Act of Mar. 26, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001(b), 2015 Tex. Sess. Law Serv. 1, 18–20 (West) (to be codified at TEX. FAM. CODE ANN. § 161.001(b)).[5]

"'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014).

---

[5] Effective April 2, 2015, the Texas Legislature amended section 161.001. Act of Mar. 26, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001, 2015 Tex. Sess. Law Serv. 1, 18–20 (West) (to be codified at TEX. FAM. CODE ANN. § 161.001). The amendment changed section 161.001(1) and (2) to section 161.001(b)(1) and (2), moving the requirements for terminating the parent-child relationship to new subparagraph (b). *Id*. These non-substantive changes do not affect our analysis. For ease of reference we refer to the statute as it will be codified.

In reviewing the legal sufficiency of the evidence in a parental termination case, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*. And we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*.

In reviewing the factual sufficiency of the evidence in a parental termination case, we "give due consideration to evidence the factfinder could reasonably have found to be clear and convincing." *Id.* We ask "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). If we determine that the disputed evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" about the finding under review, we must conclude that the evidence is factually insufficient to support the finding. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d at 266).

### Statutory Grounds for Termination

In Mother's issues two and three and Father's issues one and two, they argue that the evidence is legally and factually insufficient to support the grounds for termination.

The jury found that termination of Mother's parental rights to N, K, M, and Ma, and Father's parental rights to K, M, and Ma, should be terminated because they either

> (D) knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]; or

> (E) engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren].

TEX. FAM. CODE ANN. § 161.001(b)(1)(D) & (E). Both grounds require proof of endangerment. *See id*. "'[E]ndanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Instead, it "means to expose to loss or injury; to jeopardize." *Id*.

The focus of an allegation under (D) is the suitability of the children's living conditions. *In re M.C.*, 352 S.W.3d 563, 566 (Tex. App.—Dallas 2011, no pet.). To prove endangerment under (D), the Department had to prove that Mother and Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being. *See id*. Although the focus under (D) is the children's environment, parental conduct is nevertheless relevant because a parent's conduct "'can create an environment that endangers the physical and emotional well-being of a child . . . .'" *In re J.D.B.*, 435 S.W.3d 452, 463–64 (Tex. App.—Dallas 2014, no pet.) (quoting *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 522 (Tex. App.—El Paso 2004, pet. denied)).

The focus of an allegation under (E) is the parent's conduct, either by act or omission. *Id*. An allegation under (E) must be supported by evidence of a voluntary, deliberate, and conscious course of conduct by the parent and not an isolated act or omission. *Id*. "Endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of [illegal] drug usage." *Boyd*, 727 S.W.2d at 533. "[I]f the evidence . . . shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under (E) is supportable." *Id*.

"'As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. . . .'" *Id*. at n.4 (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Mother argues that the Department's safety concern for the children is based solely on the presence of Father in the home. And she contends that there is no evidence "that any family violence had ever actually occurred in the home"; that she did not choose "inappropriate or dangerous living conditions for her children"; that "Carlton was lying" when she testified about Mother's open wound; that N's "statements were untrue"; and that there are no medical or other records to support any of this testimony. She also contends that she "protected the children and did not allow them to be in that environment." She contends that she "was untrusting and guarded in how she interacted with the department" because the Department was attempting to use the June 2012 incident against her, which she claimed she made up.

Father argues that the Department did not prove the children's "living conditions were unsuitable or dangerous to the children or posed a risk to their physical or emotional well-being." He also argues that the Department did not offer "proof of a notable history of abuse by Father." He says that Mother recanted the allegations of domestic violence, he denied those allegations, and the Department did not offer any additional evidence to prove domestic violence occurred. He also contends that his aggressive behavior with others was explained by his frustration with being falsely accused of domestic violence.

The evidence was disputed about whether domestic violence occurred at the home in the presence of the children. Mother and Father said it never happened. On the other hand, Carlton testified about specific instances where Mother came to her for help after being assaulted by Father, and Mother made statements to others claiming that Father had assaulted her in the presence of the children. The evidence showed that N and K told others they saw Father hit

Mother on more than one occasion, and N said Father hit her once when he was trying to hit Mother. Father denied all allegations of violence, and Mother agreed the allegations were untrue. She even said she believed N had been "coached." But Department workers personally experienced demonstrations of Father's outbursts and temper. The emotional danger to the children is shown by Mother's and Father's attitude toward domestic violence. *See In re J.M.*, 156 S.W.3d 696, 707 (Tex. App.—Dallas 2005, no pet.). Their persistent denials that violence occurred in the home or that the home was an unsafe environment for the children shows that the children would be endangered in the home. *See id*. at 708–09. And although Mother and Father denied that the children were endangered, the credible evidence showed otherwise. Both N and K began to exhibit inappropriate behaviors for which they had to seek therapy after visiting with Father and Mother. *See In re J.J.B.*, No. 04-14-00299-CV, 2014 WL 4218845, at *2 (Tex. App.—San Antonio Aug. 27, 2014, no pet.) (mem. op.) (violence in home part of environment of child living in the home). The therapist diagnosed both children with posttraumatic stress. After six months of therapy, the children's behavior improved. But she expressed concern that returning the children to an environment of domestic violence would jeopardize their future emotional well-being.

Additionally, the evidence showed that Mother and Father did not always have a stable home environment because they moved frequently and at times had no place to stay, and Mother used an illegal drug while she was pregnant with Ma.

Based on this record, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Father engaged in domestic violence and that the children were affected by it. *See id*. Similarly, we conclude a reasonable factfinder could have formed a firm belief or conviction that Mother knowingly allowed the children to remain in conditions or surroundings which endangered the physical and emotional well-being of the children because she denied all

allegations of violence by Father, continued to live with him and eventually married him, and told the Department that she had to have his help. The jury reasonably could have concluded that Mother was unwilling to protect the children from Father's violence because she had not protected them before. We resolve these issues against Mother and Father.

**Best Interest of the Children**

In Mother's issue four and Father's issue three, they complain that the evidence was legally and factually insufficient to support that termination of their parental rights was in the best interest of the children.

Before terminating a parent's rights, the factfinder must find that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). In determining best interest, we consider the following non-exclusive factors: the child's desires; the child's present and future emotional and physical needs; the present and future emotional and physical danger to the child; the parenting abilities of the persons seeking custody; the programs available to the persons seeking custody to help promote the best interest of the child; the plans for the child by those persons seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

N and K initially expressed a desire to live with their Mother, and Carlton and the Department's caseworkers said the children seemed to love their parents. However, N told Carlton and the therapist that she was scared to return home to the way things were, and the therapist said that by October 2014, both N and K said they wanted to continue to live with Carlton. M and Ma were too young to express any desire about where they wanted to live.

The children's present and future emotional and physical needs require them to be protected from physical violence in the home. The therapist testified that she diagnosed both N and K with posttraumatic stress and that they exhibited inappropriate behaviors as a result of their exposure to domestic violence. Although Mother's parenting abilities seemed appropriate during visitations, Father demonstrated outbursts of temper and other inappropriate behavior. And because Mother denied that Father had committed any domestic violence, the evidence was questionable about Mother's willingness to protect the children. Mother said the people who testified or made statements about Father's domestic violence were lying and that N was "coached." She described Father's manner as "assertive." Father's counselor in the batterers program said that Father did not demonstrate he had learned enough to change his behavior towards women and never acknowledged his inappropriate behavior.

As a result of Father's and Mother's behavior toward Carlton while she had temporary custody of the children, she decided that she was not able to allow the children to be placed with her on a permanent basis. However, the Department presented evidence that it would do everything within its power to place all the children in the same home.

Having considered all the factors and the evidence in this case, we conclude that a reasonable jury could have formed a firm belief or conviction that termination of Mother's rights to N, K, M, and Ma, and Father's rights to K, M, and Ma was in the children's best interests. We resolve these issues against Mother and Father.

**Appointment of the Department as Managing Conservator**

In Mother's issue five and Father's issue four, they contend that the evidence is legally and factually insufficient to support the court's appointment of the Department as the children's managing conservator as being in the children's best interest. We review a conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Under

this standard of review, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error, but are factors in assessing whether the trial court abused its discretion. *Harris v. Vanegas*, No. 05-13-01059-CV, 2014 WL 4298098, at *2 (Tex. App.— Dallas Aug. 21, 2014, no pet.) (mem. op.).

Texas Family Code section 161.207(a) provides in part that if the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint "a suitable, competent adult," the Department, or a licensed child-placing agency as managing conservator of the child. Act of Mar. 26, 2015, 84th Leg., R.S., ch.1, § 1.088, sec. 161.207(a) (West) (to be codified as TEX. FAM. CODE ANN. § 161.207(a)).[6] An order terminating the parent-child relationship generally "divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides." TEX. FAM. CODE ANN. § 161.206(b) (West 2014).

Mother and Father argue that Texas Family Code section 153.131(a) creates "a rebuttable presumption that a parent will be named a child's managing conservator, unless the court finds that such an appointment would not be in the child's best interest 'because the appointment would significantly impair the child's physical health or emotional development' or finds that there is a history of family violence involving the parents." *See id.* § 153.131(a).[7] Both argue that Mother had a home for the children that was "clean," "neat," "furnished," "had sufficient

---

[6] Effective April 2, 2015, the Texas Legislature amended section 161.207(a). Act of Mar. 26, 2015, 84th Leg., R.S., ch.1, § 1.088, sec. 161.207(a) (West) (to be codified as TEX. FAM. CODE ANN. § 161.207(a)). The amendment changed the name of the Department from "the Department of Protective and Regulatory Services" to "the Department of Family and Protective Services" and deleted "or an authorized agency" and replaced it with "or a licensed child-placing agency." These non-substantive changes do not affect our analysis and we refer to the statute as it will be codified.

[7] Subsection (a) of section 153.131 states in part "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." TEX. FAM. CODE ANN. § 153.131(a) (West 2014).

food," and was "ready for the children to be placed there." They contend that the Department found "nothing wrong" with the home and had "no concerns."

We recently addressed this same issue in *In re N.T.*, No. 05-15-00343-CV, 2015 WL 5155713, at *11–12 (Tex. App.—Dallas Sept. 2, 2015, no pet. h.). After overruling appellant's challenge to the termination of parental rights, we said "the trial court's appointment of the Department as sole managing conservator may be considered a 'consequence of the termination pursuant to Family Code section 161.207.'" *Id.* at *12 (quoting *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *12 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.)). As in that case, neither Mother nor Father here provide "authority for the proposition that [either] is a 'suitable, competent adult' as contemplated by section 161.207(a) or that the presumption in section 153.131(a) applies to a parent whose parental rights have been terminated under Chapter 161." *Id.* And as we did in *In re N.T.*, we conclude that Mother's and Father's challenges to the trial court's appointment of the Department as sole managing conservator are without merit. *See id.* (citing *In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("A trial court does not abuse its discretion in appointing the Department as conservator of the children where the evidence is sufficient to support termination of parental rights.")).

We resolve these issues against Mother and Father.

### MOTHER'S ISSUE ONE

In issue one, Mother contends that the trial court abused its discretion by denying her motion for continuance and that her trial counsel was ineffective. We address each in turn.

### Additional Background Facts

The Department filed the original petition in this case in July 2012. By October of that year, Mother was represented by James Fordham Jr. in the Dallas County Public Defender's

Office.  Fordham filed several pretrial motions.  In June 2014, a retained lawyer, Stephen Jackson, made an appearance on behalf of Mother.  The court granted Mother a continuance in August, and the court set the case for trial on February 2, 2015.  On the day of trial, Jackson did not appear.  There were discussions on the record that Jackson may have been ineligible to practice law for administrative reasons, but that he had not filed a motion to withdraw.  The record showed that the trial court was aware of the situation involving Jackson and, out of an abundance of caution, appointed the Public Defender's Office as standby counsel before trial.  Fordham was once again assigned to the case.  Fordham's wife became ill, though, and Charles Vaughan of the PD's Office stepped in to represent Mother.  Vaughan contacted Mother; Mother told him she did not want them to represent her and to file a motion to withdraw.  Mother ultimately changed her mind, and when Fordham and Vaughan realized they would be trying the case, they made an oral motion for continuance stating they were unprepared because they thought they were going to withdraw.  Fordham told the court that this was his first day back at the office having been away due to his wife's illness.  The Department opposed the continuance, arguing that Mother was aware of the trial date and should have been in contact with her lawyers.  The trial court said it was up against a statutory deadline for trying the case or dismissing it and denied the continuance.

### Motion for Continuance

Mother contends the trial court abused its discretion by denying her motion for continuance.  A motion for continuance must be in writing, state the specific facts supporting the motion, and be verified or supported by an affidavit.  TEX. R. CIV. P. 251; *In re A.A.*, No. 05-07-01698-CV, 2008 WL 2514346, at *2 (Tex. App.—Dallas June 25, 2008, no pet.) (mem. op.).  Mother does not cite the record where she filed a motion for continuance in writing and verified by affidavit, and we have not found a motion in the appellate record.  When a motion for

–28–

continuance does not comply with rule 251, we presume the trial court did not abuse its discretion by denying the motion. *In re E.L.T.*, 93 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Additionally, the statutory deadline for trial of the case was looming and Mother had already been granted one continuance. *See In re A.A.*, 2008 WL 2514346, at *3. Consequently, we cannot conclude that the trial court abused its discretion by denying a continuance. We resolve this subpart of issue one against Mother.

## Ineffective Assistance of Counsel

Mother also contends in issue one that her trial attorneys were ineffective. "[T]he statutory right to counsel in parental-rights termination cases embodies the right to effective counsel." *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). When reviewing a claim of ineffective assistance in a parental-rights termination case, we follow the test enunciated in *Strickland v. Washington*. *Id*. at 544–45 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Mother must satisfy two elements. First, she "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 545. Second, she "must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive [her] of a fair trial, a trial whose result is reliable." *Id*.

Mother claims that her counsel's performance was deficient because they "were unfamiliar with the updated facts of the case" and "unfamiliar with what legal grounds the department was moving forward on at trial," but Mother does not cite us to the record where any "updated facts" or "legal grounds" were presented about which her attorneys were unfamiliar. She contends her counsel's performance was deficient because they "failed to object to hearsay statements" by the children and JE, but she does not cite any specific statements by the children

and JE to which her attorneys did not object. She contends her attorneys "did not have enough time to prepare for trial," "had not adequately consulted with mother to determine what witnesses needed to be present in court to testify to mother's credibility," and "that there were witnesses to an incident between her and [Father]," that could have been called to support her credibility. But she does not state to which incident she refers, who the witnesses were, or what they would have testified about. She contends that her attorneys "failed to introduce text messages which . . . could clarify [certain matters] for the jury" and did not introduce documents from her domestic violence class that would have supported her testimony that Father never committed domestic violence against her, but Mother does not state what these text messages said, when they were sent, or otherwise provide record support for her contentions.

A party must support her arguments and contentions with record references. TEX. R. APP. P. 38.1(i). But Mother does not provide any record citations to support her contentions. Additionally, Mother filed a pro se motion for new trial in which she raised ineffective assistance of counsel, but she did not attach affidavits to support her motion or obtain a hearing on her motion in which she introduced evidence to support her claim.

Regardless, we have reviewed the record for purposes of Mother's sufficiency claims and conclude that her trial counsel was not ineffective. Fordham had previously represented Mother before she retained counsel and was familiar with the facts of the case. During the course of the trial, he took several witnesses on voir dire to question their personal knowledge on the subject of examination; made numerous objections to testimony and evidence, many of which were sustained; thoroughly examined each witness; and moved successfully for directed verdict on two of the grounds alleged for termination. Having reviewed the entire record, we conclude that Mother has not shown "a deficient performance by counsel so serious as to deny [her] a fair and

reliable trial." *See In re J.O.A.*, 283 S.W.3d at 342. We resolve this subpart of issue one against Mother.

**CONCLUSION**

We affirm the trial court's final decrees of termination.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE

150361F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF N.E., A CHILD,

No. 05-15-00361-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas

Trial Court Cause No. DF-12-13599-Z.

Opinion delivered by Justice Lang-Miers, Justices Francis and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services recover its costs of this appeal from appellant Triston Shontay Groover Weathersby.

Judgment entered this 8th day of September, 2015.



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF K.G., M.G., AND MA.G., CHILDREN

No. 05-15-00363-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-13-17435-Z.
Opinion delivered by Justice Lang-Miers, Justices Francis and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services recover its costs of this appeal from appellants Triston Shontay Groover Weathersby and Jacobi Lee Weathersby.

Judgment entered this 8th day of September, 2015.